Citron v. Minnesota Mining          CV-93-662-JD  09/27/95

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE


Samuel Citron

     v.                              Civil No. 93-662-JD

Minnesota Mining & Man. Co.


O R D E R


The plaintiff, Samuel Citron, has brought this patent infringement action against defendant Minnesota Mining and Manufacturing Company ("3M").  The answer filed by 3M denies infringement.  In addition, 3M has counterclaimed for a judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring the patent invalid and not infringed.  Jurisdiction is grounded upon 28 U.S.C. §§ 1331, 1332(a), and 1338.  Currently before the court is 3M's motion for summary judgment (document no. 23).


Background

Citron is the holder of U.S. Patent No. 4,223,058 ("'058 patent"), entitled Materials for Use in Framing Pictures and Documents.  The patent contains four claims, claims 2, 3, and 4 dependent upon claim 1.  The claims of the '058 patent are

directed to an adhesive tape with a colored adhesive portion and a transparent or translucent non-adhesive portion. The claimed invention has a continuous adhesive along one portion of its longitudinal surface. Thus, the full length of the tape has an uncoated margin which cannot stick. As envisioned by Citron and illustrated below[1], the adhesive portion sticks to a wall or an album page on which a document[2] is mounted. The non-adhesive portion then provides a pocket into which the edges of the document extend. For example, a document would be placed on an album page and the tape applied around the border of the document such that the adhesive only contacts the album page, not the

---

[1]All product illustrations are drawn from the relevant patent.

[2]For purposes of clarity, throughout the order the court will refer to the item to be mounted, whatever it may be, as a document.

document itself.  The colored adhesive would frame the mounted

document.

        Citron claims that the '058 patent is infringed by Post-it™

brand tape flags, a product manufactured and marketed by 3M.  The

accused product is comprised of a tape approximately one and

three-quarter inches long and one inch wide.  Two-thirds of the

3

tape is coated with an adhesive.[3]  The non-adhesive portion is coated with brightly colored ink.  The adhesive portion is essentially transparent when attached to a white substrate, allowing the user to view the content of the page to which it is applied.[4]  When attached to a colored substrate, the adhesive portion is seen as having a white hue through which material underneath is clearly visible.

The accused product is designed to flag, or highlight, specific material on a sheet.  The non-adhesive portion extends beyond the edge of the page to act as an obvious marker.  The

---

[3]The adhesive is patented, U.S. Patent No. 4,907,825, and designed to allow the flag to be repeatedly adhered to, removed from, and repositioned on a surface without damage to the surface.  Herbert Declaration, Exhibit C.

[4]Transparent is defined as having the property of transmitting rays of light through its substance so that bodies situated beyond or behind can be distinctly seen.  Random House Dictionary of the English Language, Unabridged (2d ed. 1987) 2012.  Translucent is defined as permitting light to pass through but diffusing it so that persons, objects, etc., on the opposite side are not clearly visible.  Id. at 2011.  A frosted glass window is translucent.  A clear glass window is transparent.  The terms are often used synonymously to mean clear or transparent. Id.  The antonym of both is opaque.  Id.

flags are individually portioned and dispensed through a patented dispenser.


[picture here]


## Discussion

In its motion, 3M argues that the Post-it™ flags cannot infringe the claims of the '058 patent as a matter of law because they are not coated with a colored adhesive. Citron responds that summary judgment must be denied, arguing that whether the Post-it™ adhesive is colored is a question of fact that must be resolved at trial.

Summary judgment is appropriate when the "pleading, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "The burden is on the moving party to establish the lack

5

of a genuine, material factual issue, and the court must view the record in the light most favorable to the nonmovant, according the nonmovant all beneficial inferences discernable from the evidence." Snow v. Harnischfeger Corp., 12 F.3d 1154, 1157 (1st Cir. 1993) (citations omitted). Once the moving party has met its burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial[,]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (citing Fed. R. Cia. P. 56 (e)), or suffer the "swing of the summary judgment scythe." Jardines Bacata, Ltd. v. Diaz-Marquez, 878 F.2d 1555, 1561 (1st Cir. 1989). "In this context, `genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party, Anderson, 477 U.S. at 258; `material' means that the fact is one `that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Property, 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson, 477 U.S. at 248).

I.  Applicable Legal Standards

The law is well established that determining whether a claim has been infringed requires a two-step analysis. First, the court must interpret the claims of the patent as a matter of law to determine their meaning and scope. Markman v. Westview

6

Instruments, Inc., 52 F.3d 967 , 979 (Fed. Cir. 1995); Senmed, Inc. v. Richard-Allan Med. Indus., Inc., 888 F.2d 815, 818 (Fed. Cir. 1989). Second, the trier of fact must determine whether the claim as properly construed covers the accused devise or process. Markman, 52 F.3d at 976; Carrol Touch, Inc. v. Electro Mechanical Systems, Inc., 15 F.3d 1573, 1577 (Fed. Cir. 1993); Read Corp. v. Portec, Inc., 970 F.2d 816, 821 (Fed. Cir. 1992). A claim covers an accused device if the device embodies every limitation of the claim, either literally or by an equivalent. Read, 970 F.2d at 822; Johnston v. IVAC Corp., 885 F.2d 1577, 1581 (Fed. Cir. 1989).

II. Claim Construction

To construe a patent claim, the court ascertains the meaning of the claims with reference to three sources: the claim itself, the claim specification, and the claim's prosecution history. Markman, 52 F.3d at 979 (citations omitted). The court must construe the claims in the same manner as the claim would be construed by those skilled in the art, Loctite Corp. v. Ultraseal Ltd., 781 F.2d 861, 867 (Fed. Cir. 1985), avoiding construction that renders claim language meaningless or superfluous. See, e.g., Texas Instruments, Inc. v. United States Int'l Trade Comm'n, 988 F.2d 1165, 1171 (Fed. Cir. 1993). Words of a claim are generally given their ordinary and accustomed meaning, unless

7

it appears from the specification or the file history that they were used differently by the inventor. Carroll Touch, 15 F.3d at 1577. However, "a patentee is free to be his or her own lexicographer . . . and thus may use terms in a manner contrary to or inconsistent with one or more of their ordinary meanings." Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1563 (Fed. Cir. 1990) (internal citation omitted), cert. dismissed, 499 U.S. 955 (1991). The specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims. . . . The caveat is that any special definition given to a word must be clearly defined in the specification." Markman, 52 F.3d at 979-80 (internal citations omitted).

While the specification may define terms used in the claims, the claims define the precise scope of the patent. Autogiro Co. of America v. United States, 384 F.2d 391, 395 (Ct. Cl. 1967). For example, references in the specification to a preferred embodiment, or an illustrative example, do not limit the scope of the patent claim. Specialty Composites v. Cabot Corp., 845 F.2d 981, 987 (Fed. Cir. 1988). "The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims." Markman, 52 F.3d at 980. Thus, a claim is not limited to devices described in the

8

specification unless the specification requires a certain limitation. Lemelson v. United States, 752 F.2d 1538, 1552 (Fed. Cir. 1985); see, e.g., Laitram Corp. v. Cambridge Wire Cloth Co., 863 F.2d 855, 865 (Fed. Cir. 1988) (references in specification to preferred embodiment with a square shaft "not a basis here for limiting `noncircular' to square or regular polygonal shafts"), cert. denied, 490 U.S. 1068 (1989). The court must not confuse the patentee's use of the specification as a dictionary to define particular words and phrases in a claim, which is proper, with reading limitations into a claim from the specification "wholly apart from any need to interpret what the patentee meant by particular words or phrases." E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed. Cir.), cert. denied, 488 U.S. 986 (1988); see also Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc., 34 F.3d 1048, 1054 (Fed. Cir. 1994) (claims are not to be interpreted by adding limitations appearing only in the specification -- although specifications may indicate that certain embodiments are preferred, particular embodiments appearing in specification will not be read into the claims when claim language is broader than such embodiments).

The patent's prosecution history is the "`undisputed public record' of [the] proceedings in the Patent and Trademark Office. . . ." Markman, 52 F.3d at 980. The prosecution history is an

9

invaluable source of information when interpreting claims in that

> [t]he construction of the patent is confirmed by the
> avowed understanding of the patentee, expressed by him,
> or on his half [sic], when his application for the
> original patent was pending. . . .  [W]hen a patent
> bears on its face a particular construction, inasmuch
> as the specification and claim are in words of the
> [patentee, . . . such a construction may be confirmed
> by what the patentee said when he was making his
> application.

Id. (citing Goodyear Dental Vulcanite Co. v. Davis, 102 U.S. 222, 227 (1880)).  Claims may not be interpreted in a way that is "incontestably inconsistent with the position taken by [the patentee] during prosecution of [the] patent application, with the repeated description of the invention in the specification, with the explicit amendment of the claim language . . ., and with [the patentee's] argument for patentability . . . ."  Senmed, 888 F.2d at 820.

While the court cannot employ extrinsic evidence to construe the claim, amplify the specification, or augment the prosecution history, the court may refer to extrinsic evidence to aid the court's understanding of the claim language.  Markman, 52 F.3d at 980.  Extrinsic evidence includes "all evidence external to the patent and the prosecution history, including expert and inventor testimony, dictionaries, and learned treatises."  Id.  The court, in its discretion, may use extrinsic evidence to explain scientific principles, the meaning of technical terms, and terms

10

of art that appear in the patent. Id. The court "receive[s] extrinsic evidence in order `to aid the court in coming to a correct conclusion' as to the `true meaning of the language employed' in the patent." Id. (citations omitted). Extrinsic evidence "amounts to no more than legal opinion" as to proper claim construction, and, therefore, extrinsic evidence cannot be relied upon to change the true meaning of the patent claims. Id. at 981.

1.  The Claims

Claim 1 of the '058 patent reads:

A tape for use in attaching a sheet to a surface, said tape including an adhesive coat on one face that extends the full length thereof and from one edge part way across said one face with the uncoated portion of said one face to overlie a margin of said sheet, said adhesive colored and disposed to establish a straight and continuous demarcation between the coated and uncoated portions of said one face that parallels the edges of said tape, said tape at least sufficiently translucent to enable said adhesive portion to be observed through said tape thus to enable said tape to be applied against the surface along a margin of the sheet with the inner edge of the adhesive substantially in abutment with the edge of said margin but without adhesive contacting said sheet or to establish a frame the sheet receiving dimensions of which are established by said lines.

The remaining claims are dependent on claim 1 and describe various embodiments of the claim 1 tape.

Claim 2 reads:

11

The tape of claim 1 in which the tape is transparent.

Claim 3 reads:

The tape of claim 1 in which the tape is colored, the color of the adhesive distinguishable from that of the tape.

Claim 4 reads:

The tape of claim 1 in which the other face of the tape is printed.

2.  Overview of the Parties Positions

The issue presented by 3M's motion is the proper construction of the phrase "said adhesive colored and disposed to establish a straight and continuous demarcation between the coated and uncoated portions of said one face that parallels the edges of said tape" as recited in claim 1 of the '058 patent. In the instant case, the controversy centers around the use of the term "colored." According to 3M, the '058 patent requires an adhesive that has been "colored" through the addition of a pigment or dye. See generally, Defendant's Memorandum in Support of Motion for Summary Judgment. In support, 3M has proffered the declaration of Hoy Y. Wong, a product engineering specialist employed by 3M. Wong has been involved in the development and manufacture of the Post-it™ adhesive since 1973, and is familiar with the formulation of the adhesive and the ingredients that are used in the adhesive. Wong Decl., ¶ 5. According to Wong,

12

3M's Post-it™ adhesive is not a colored adhesive. No pigment or dye is used in 3M's Post-it™ adhesive. The Post-it™ adhesive is formulated using the clearest ingredients that 3M is able to obtain. The Post-it™ adhesive is manufactured to be as transparent as possible.

\* \* \* \*

3M's Post-it™ flags are made with several layers of coatings. On the translucent portion of the tape flag, e.g., the portion of the flag that is not coated with colored ink, there are four layers of coating. These are (a) matte coating, which is added to facilitate writing on the tape without smudging, (b) a coating called "LAB" which is applied over the matte coating and serves as a "release" coat that aids the release of one strip when it is struck to another. e.g., when they are assembled into pads, (c) a coating of primer, which is necessary for the adhesive to stick to the plastic tape, and (d) a coating of Post-it™ adhesive.

In terms of transparency, the lab coat is the most transparent, followed by the adhesive coat, and the primer coat. The matte coating is the least transparent of all the coatings.

Wong Decl., ¶¶ 6, 8, 9.

In response, Citron argues that the term colored in '058 patent encompasses naturally occurring colors and that the patent has no requirement that the color in the adhesive be obtained through the addition of a colorant. See generally, Plaintiff's Memorandum in Opposition to Motion for Summary Judgment. Citron asserts that the Post-it™ adhesive has a naturally occurring color. Id. In support, Citron directs the court to the Post-it™ flags themselves. Citron notes that when the tape is not

13

attached to a substrate, it is possible to distinguish where the adhesive portion ends without reference to the brightly colored non-adhesive portion because the adhesive does not always reach to the non-adhesive portion, leaving a small strip of tape that is neither adhesive nor brightly colored. Citron argues that because it is possible to discern the adhesive coat, the adhesive must be "colored."[5] In addition, Citron notes that when placed upon a background that is not white, the adhesive creates some occlusion and the line of demarcation created by the adhesive can been seen against the surface of the substrate after application of the flag. Thus, whether the adhesive is visible is affected by the background on to which the tape is attached.

### 3. The Court's Construction

The court construes claim 1 to require an adhesive that has been made clearly and easily visable through the addition of a colorant both before and after being secured to a sheet. The hue of the adhesive must be sufficiently distinct that if placed around a document, the adhesive would create a border framing

---

[5]Citron also notes Wong's deposition testimony in which he states that the adhesive is not as clear as common glass and that it is possible to see some light refraction from the adhesive. Citron would have the court construe the term color to mean anything other than completely transparent.

14

said document.[6]  The court reaches this conclusion after consideration of the prosecution history, the claim language, and the specification.

### a. The Prosecution History

The court begins with the prosecution history as it provides the most explicit guidance.  While prosecuting the application for the '058 patent, Citron repeatedly emphasized the importance of a colored adhesive to his invention.  After the patent examiner rejected the application for the '058 patent as unpatentable over three prior art references known as "Cherrin," "Steinbach," and "Stevens," Citron filed a response, Exhibit E to Herbert Decl., arguing:

> The claims of the present invention require the combination of an adhesive that is colored and a tape that is sufficiently translucent to enable the color of the adhesive to be seen through the tape with the adhesive extending part way across the tape and extending continuously and straight the full length thereof.  The references separately or combined do not teach such a tape.  There is no reference that teaches the use of a colored adhesive and it is submitted that the use of such an adhesive is clearly obvious only in the light of what applicant has disclosed.  With the use of colored adhesives the objectives of applicant's invention can be attained without having to process the tape.  It is submitted that the claims cannot, accordingly, be rejected on applicant's patent.

---

[6]The court notes that in using the phrase "capable of framing" in describing the property of a "colored" adhesive, the court is not implying that such a use would have to be intended in order to constitute an infringement.

15

Response at 16-17.

Citron then went on to distinguish each of the three prior art patents on the basis that they did not have colored adhesives.[7]  With regard to the Cherrin reference, Citron stated that "the adhesive was _not colored_ and the tape did not provide a straight continuous colored adhesive coating that extended part way across it."  Response at 17.  Citron similarly argued that the adhesive employed in the Steinbach and Stephens references were "not colored."

---

[7]The prosecution history states:

> The patent to Cherrin disclosed tape products consisting of sections of specific dimensions which were to be attached to a surface to contain and conceal documents and consisted of a tape having an adhesive surface covered with a colored layer that blocked the adhesive except at its margins thus to enable each section to be adhered to a surface with the document confined in the area where the colored layer provided a non-adhesive surface.  The adhesive was not colored and the tape did not provide a straight continuous colored adhesive coating that extended part way across it.

> The patent to Steinbach disclosed an opaque tape having three lengthwise sections on its rear face, adhesive, hectographic, and non-adhesive.  The adhesive is not colored.  The lines of demarcation between tits sections were not visible though the tape and the tape could be oriented with resect to a letter to be corrected only by means of letters exposed at the ends of the short tap section used in making a correction.

> The patent to Stephens disclosed a masking tape and such are opaque.  The adhesive is not colored.

Response at 000500-501.

16

In this reply, by stating that the adhesive of the '058 patent be colored, the patent is understood as requiring an adhesive with a distinct pigment making it easily visible unlike that found in any standard tape adhesive.[8]  Therefore, the

<hr />

[8]In a patent application filed by Citron subsequent to the patent application that matured into the '058 patent, Citron discusses the '058 patent, explaining that the '058 adhesive is differentiated by a standard adhesive through the process of "coloring":

> It is respectfully submitted that Patent No. 4,223,058 supports the concept that the line of demarcation between the uncoated and adhesive coated portions of a tape is not visibly useful for appellant's purpose a result achieved <u>by coloring</u> the adhesive.

> The Examiner's statement that <u>the adhesive itself would provide a visible line of demarcation by being less translucent that the uncoated portion of the tape is not supported by any tape with which the appellant is familiar nor is reference to any such tape given</u>.

> For that reason, samples of products are attached hereto and while these do not appear to be made in accordance with the patent to Cherrin, they are for use for the same purpose as the products of that patent. <u>By peeling the backing layer from the product marked "Packing List Enclosed" it will be seen that the uncoated and adhesive coated portions of a transparent sheet show a line between those portions</u> but that the portions, if not equally translucent are clearly so nearly so that in any use in accordance with appellant's concepts, the line of demarcation would be of no use whatever.

Reply Brief to Commissioner of Patents and Trademarks at 2, Defendant's Reply to Citron's Opposition to Motion for Summary Judgment, Exhibit J (emphasis added).  The court does not rely upon this extrinsic evidence to resolve the ambiguity in the claim, but merely notes that the extrinsic evidence presented by

17

prosecution history excludes from the patent the change in transparency occurring when a portion of tape is coated with an adhesive that would be considered standard by the industry, and excludes from the patent term "color" any hue, tone or pigment commonly found in standard adhesives.[9]  However, this alone does not require that the '058 adhesive obtain its hue through the addition of a colorant, only that, whether naturally or made through artificial means, the adhesive would need to be clearly and easily visible when placed on the tape, significantly more visible than any inherent contrast affected when a standard adhesive is placed on tape.

Nonetheless, what is striking about the prosecution history is the repeated use of the term "not colored."  Throughout the patent, clarity is defined in terms of transparency or translucency.  In the prosecution history, there are reference to both translucency and "not colored."  Translucent is used to describe the clarity of the '058 patent tape.  However, the adhesives of the prior art are described as "not colored."  Thus, the prosecution history makes plain that the phrase not colored means something other than clear or devoid of hue.

_____

the parties supports the claim construction.

[9]The parties have not submitted extrinsic evidence that would show that either common tape adhesives are absolutely transparent or possessing some level of color.

18

As defined by the prosecution history, the patent teaches an adhesive that is not a standard adhesive. A standard adhesive is "not colored." Not colored is not presented as being synonymous with translucent or devoid of hue. Rather, a "not colored" adhesive is presented as synonymous with a standard or common adhesive. The patent history takes the position that the '058 patent adhesive is different from common "not-colored" adhesives. The import is that the patent adhesive is made unique by being altered from its natural state, <u>i.e.</u>, the process of adding a colorant. This construction is supported by the claim language and prosecution history.

### b. The Claim Language

The claim language further supports the court's construction. The claim teaches "a tape for use in attaching a sheet to a surface, said tape including an adhesive coat on one face that extends the full length thereof and from one edge part way across said one face with the uncoated portion of said one face to overlie a margin of said sheet, <u>said adhesive colored and disposed to establish a straight and continuous demarcation</u> between the coated and uncoated portions of said one face that parallels the edges of said tape." Claim 1 (emphasis added). The claims of a patent, like other provisions in legal writings, are to be reasonably construed using the "well-settled rules of

construing all instruments" to ascertain meaning.  <u>Markman</u>, 52 F.3d at 981.  Thus, claims in a patent are subject to the same general rules of construction as any other written instrument.  2 William C. Robinson, <u>The Law of Patents for Useful Inventions</u> § 732 at 481-82 (1890); 1 Anthony W. Deller, <u>Patent Claims</u> § 21 (2d ed. 1971).

Central to the parties' dispute is the lack of precision in the language used in this claim.  Terms in a claim are to be either unambiguous or defined in the patent specification.  <u>See generally</u>, <u>Markman</u>, 52 F.3d at 967.  Unfortunately, in this patent, neither is true.  The term colored is essential to understanding the scope of the claim.  Color is a common word understood to have numerous meanings.  "Colored" may mean anything other than absolutely clear or may mean anything other than white.  Items that are tinted or shaded are sometimes considered colored.  Colored is used as a synonym for opaque.  Colored may be used as an adjective and as a verb.  Likewise, as discussed <u>supra</u>, transparent and translucent create similar difficulties.  They have different technical definitions but are used interchangeably, a use sanctioned by the <u>Random House Dictionary</u>.  This same dictionary lists opaque as the antonym of both.

Citron argues that "colored" is an adjective. To construe the claim as advocated by Citron, it is necessary to find that the term colored is used as an adjective describing a property of the adhesive. Conversely, to construe the claim as advocated by 3M, the court would have to find that the term color has been used as a verb describing a process by which the natural hue of an adhesive is altered. Either use is plausible in context of the claim. Neither party has submitted extrinsic evidence that the term colored is a term of art with a meaning particular to the tape industry. From the confusing and inconsistent use exhibited in the pleadings and memoranda, it appears that the term is as malleable inside the industry as out. However, "it is only fair (and statutorily required) that competitors be able to ascertain to a reasonable degree the scope of the patentee's right to exclude." Markman, 52 F.3d at 978 (citing Merrill v. Yeomans, 94 U.S. at 573-74). Therefore, the court turns to the language of the claim.

The claim requires that the adhesive be both colored and disposed. Like colored, the term disposed may also be construed as either an adjective or a verb. Because the terms colored and disposed both follow the term adhesive, the canons of

21

construction require the court to construe them alike.[10] Therefore, the court considers the proper construction of disposed to aid in construction of the term colored.

According to the Random House Dictionary, disposed, when used as an adjective, is defined as having a certain inclination to do something. Random House Dictionary at 568. Disposed, the verb, means to put in a particular or suitable place. Random House Dictionary at 568. Therefore, if the court were to construe the term disposed as an adjective, then claim 1 would teach an adhesive that has an inclination or tendency to establish a straight and continuous demarcation between the coated and the uncoated portions. If the court were to construe the term disposed as a verb, the claim would teach an adhesive placed on the tape to establish a straight and continuous demarcation between the coated and the uncoated portions.

The most natural reading of the term disposed in context of the claim is as a verb. It would not make sense for an adhesive to be naturally inclined to establish a straight and continuous demarcation when applied to a tape. However, the term is more logically read to require that the adhesive be placed onto the tape in such a straight and continuous line. Therefore, the

---

[10]E.g., if the terms were separated such that phrase read "said colored adhesive disposed . . . ." the court would construe one term as an adjective and the other a verb.

court construes disposed as a verb and likewise will construe the term colored as a verb.

The verb "to color" connotes a physical process through which color is added. According to the Random House Dictionary, colored, when used as a verb, means "to give or apply color to; tinge; paint or dye." Random House Dictionary at 406. As so construed, the phrase "said adhesive colored and disposed to establish a straight and continuous demarcation" teaches an adhesive that has been processed and then applied to a transparent tape in a straight and continuous line, thereby creating a visible line between the adhesive and non-adhesive portions of the tape.

c. The Specification

Finally, the court turns to the specification. The specification makes several references to the colored adhesive but provides neither a definition nor context from which a definition may be deduced. The specification does state that the adhesive portion of the tape must easily be capable of framing a document, col. 2; l. 13, and that the adhesive must be capable of being viewed through both a transparent tape and a translucent tape. Thus, the specification further delimits the capability of the colored adhesive but provides no assistance in determining

23

whether that color must be obtained through a process or can be naturally occurring.

The specification does, however, use the term colored in a different context. Where possible, like terms are to be construed in like fashion. Therefore, the court obtains further guidance if it can discern the meaning of colored as used elsewhere in the specification.

The specification discusses color with reference to the tape rather than the adhesive. The specification explains that

> [t]he adhesive is colored and the tape if sufficiently translucent to enable to the adhesive to be seen through the tape. The demarcation between the coated and uncoated portion of the tape can thus be precisely located with reference to the sheet to be secured or in forming the frame therefor while the color of the tape makes the frame stand out and usually matching that of other nearby frames. The tape may be colored or printed provided that the adhesive is still readily visible.

Col. 1, lines 41-49. It commonly is understood that an article that is printed undergoes a printing process. Thus, it is clear that the phrase "tape that is colored or printed" presumes that the tape will undergo some process to obtain print. Tapes do not have natural a property of "print." Again, the canons of construction require that the parallel terms colored and printed be construed in a like fashion. Therefore, to the extent the specification states that the tape may be colored, it must be read as referring to a process through which a colorant is added

24

to the tape and not any natural property of color the tape might have. That the term colored is used in this fashion in the specification lends support to a similar construction of the term in both the claim and throughout the patent.

### 4. Infringement

To establish literal infringement, every limitation set forth in a claim must be found in an accused product. Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 796 (Fed. Cir. 1990). If an accused product meets every limitation of an asserted claim directed to structure, at least equivalently, that product infringes under the doctrine of equivalents. An accused product that does not literally infringe a claim may infringe under the doctrine of equivalents if "it performs substantially the same function in substantially the same way to obtain the same result." Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608 (1950). Infringement, both literal and under the doctrine of equivalents, is a question of fact. SSIH Equip. S.A. v. United States Int'l Trade Comm'n, 718 F.2d 365, 376 (Fed. Cir. 1983).

### a. Literal Infringement

As construed, the claim requires the addition of a colorant to the adhesive. The parties do not dispute that no colorant has

25

been added to the accused device.  Thus, the claim does not read on the accused device and there can be no literal infringement.

### b.  Infringement Under the Doctrine of Equivalents

To establish infringement under the doctrine of equivalents, Citron must show that 3M's Post-it™ adhesive is the equivalent of the colored adhesive required by the Citron claims.  See Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1533 (Fed. Cir. 1987); Pennwalt Corp. v. Durant-Wayland, Inc., 833 F.2d 931, 935 (Fed. Cir. 1987), cert. denied, 485 U.S. 961, 485 U.S. 1009 (1988).  An adhesive that cannot be observed either as a frame or an alignment guide cannot be equivalent to a colored adhesive that is employed for the purposes of those functions.  See Pennwalt, 833 F.2d at 935-36.

The court can conceive of several arguments the defendant might raise to support an assertion that Citron is unable to demonstrate equivalence for each limitation.  See, e.g., Lear Siefler, Inc. v. Sealy Mattress Co., 873 F.2d 1422, 1427 (Fed. Cir. 1989).  However, the defendant has argued only that Citron is unable to show that the accused device has the equivalent of the "colored" adhesive.

It is undisputed that the adhesive is visible.[11]  Whether

---

[11]  There is no evidence before the court regarding whether it is possible for an adhesive to be absolutely clear.  If the Post-it adhesive were the clearest possible incantation of

26

the adhesive is sufficient to serve as a frame or an alignment guide is a question of fact to be resolved by the trier.

### Conclusion

The defendant's motion for summary judgment (document no. 23) is granted in part and denied in part.  The court construes the claim to include an express limitation that a colorant be added to adhesive and finds that the defendant's Post-it™ flags do not literally infringe the plaintiff's patent as a matter of law as the Post-it™ adhesive has no color added.  The court finds that whether the color of the natural color of the Post-it™ flags is equivalent to the claim limitation is a question of fact that cannot be resolved by the court under Rule 56 and therefore denies summary judgment on this issue.

SO ORDERED.

_____
Joseph A. DiClerico, Jr.
Chief Judge

September 27, 1995

cc:  Mark D. Lorusso, Esquire
     Martin L. Gross, Esquire
     Gregory A. Madera, Esquire

---

adhesive, then to find that it is colored as used in the '058 patent would be tantamount to ruling that every adhesive is colored as used in the patent.